Filed 5/6/25  P. v. Metoyer CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARIUS RENO METOYER et al.,<br><br>    Defendants and Appellants. | G062772<br><br>(Super. Ct. No. RIF1805449)<br><br>O P I N I O N |

Appeals from judgments of the Superior Court of Riverside County, Bernard Schwartz, Judge. Affirmed in part, reversed in part, and remanded as to both defendants.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant Marius Reno Metoyer.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Carl Dashawn Johnson.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Following a joint jury trial, defendants Marius Reno Metoyer and Carl Dashawn Johnson were convicted of first degree murder and attempted premeditated murder, and Metoyer was separately found guilty of two counts of aggravated assault. In addition, the jury found true several enhancement allegations, including the special circumstances allegation that the murder was committed to further the activities of a criminal street gang. The trial court sentenced defendants to life in prison without the possibility of parole, plus consecutive life terms.

On appeal, defendants raise a variety of evidentiary, instructional, and sentencing claims. They also challenge the sufficiency of the evidence in certain respects and assert they did not receive sufficient notice the attempted murder charge included an allegation of premeditation. We agree with defendants that the prosecution failed to comply with the pleading and notice requirements for charging attempted *premeditated* murder. We thus reverse the jury's premeditation findings on the attempted murder count, as well as the life sentences those findings precipitated.

We also agree with Johnson that his conviction for first degree murder must be reversed due to insufficient evidence. Although the record shows he was actively involved in the shooting that led to the victim's death, there is not substantial evidence to support the sole theory of causation on which the jury was instructed. Therefore, we reverse Johnson's murder conviction, along with its attendant enhancements.

Due to these partial reversals, the matter will be remanded for resentencing as to both defendants. In all other respects, we affirm the judgments.

## STATEMENT OF FACTS

### *Overview*

This case involves two groups of young men who belonged to rival gangs and who crossed paths at the Rio Rancho Super Mall in Moreno Valley on Christmas Eve of 2018. The first group consisted of defendants Metoyer and Johnson and two other members of the Edgemont gang, Jovante Butler and Jalin Johnson.[1] The second group consisted of Justin Ruff, Keionedre Jones, Noe Reyes, and Jzhiad Christopher, all members of the Sex Cash gang. The two gangs were bitter enemies and often battled for turf in the Moreno Valley area.

During their encounter at the mall, Metoyer assaulted Ruff and Jones with a firearm. Then Metoyer and Johnson both opened fire on Reyes and Christopher in their vehicle. Reyes was killed and Christopher was wounded in the gunfire. However, the prosecution was unable to prove which shots hit which victim, so the identity of the actual killer was never established.

### *The Shooting*

On the night of the shooting, defendants' group arrived at the mall at around five o'clock. Surveillance video shows Metoyer, Butler and Jalin walking in the parking lot toward the mall entrance as Johnson slowly

---

[1] Because Jalin shares the same last name as defendant Johnson, we will refer to him by his first name to avoid confusion. No disrespect is intended.

3

drives by them in a white BMW.[2] While Johnson was parking his car, Metoyer and Butler proceeded to enter the mall, but Jalin stayed outside momentarily. He can be seen on the surveillance videos walking in front of a black Nissan Sentra as it entered the parking lot. But eventually he entered the mall and met up with Metoyer and Butler at a jewelry store inside.

Ruff was driving the Sentra, and Jones was in the front passenger seat. They ended up parking their vehicle right near where Johnson had parked, but Johnson made no attempt to confront them at that time. Instead, he exited his car and lingered in the area, making his presence known. Then he entered the mall and met up with his crew at the jewelry store.

At that point, Ruff moved the Sentra a couple of parking spaces closer to the mall entrance. He and Jones then remained inside the Sentra in anticipation of Reyes's arrival at the mall. They were expecting to sell Reyes some marijuana once he got there, but due to intervening events, that transaction never occurred.

Defendants' group stayed in the jewelry store for about 10 minutes. It is clear from the surveillance footage Johnson had a large handgun in the left front pocket of his shorts during that time. He still had the gun in his possession when he and his companions left the jewelry store and walked back outside.

Upon exiting the mall, defendants' group began walking toward Ruff and Jones, who were standing outside the Sentra unarmed. While Johnson flanked the Sentra from one side, Jalin surreptitiously handed Metoyer a gun. Unaware of the handoff, Ruff and Jones started walking

[2] Multiple surveillance videos from the mall were admitted into evidence at defendants' trial and are part of the record on appeal.

4

toward Metoyer, Jalin and Butler. But the duo stopped abruptly once they realized Metoyer was armed. Holding the gun in his outstretched arm, Metoyer trained the weapon on Ruff and Jones for several seconds as they retreated back to the Sentra.

Around this time, Reyes arrived on the scene in his Chevy Camaro and came under fire from defendants' group. Some of the shooting occurred just outside the range of the surveillance cameras. However, for purposes of this appeal, it is largely undisputed that Metoyer opened fire on Reyes's car from one side, and then, seconds later, Johnson opened fire on the vehicle from the other side. (In fact, the surveillance video captures Johnson shooting in the direction of the car.)

During the barrage, Reyes was shot three times, in the head and neck, and his passenger Christopher sustained gunshot wounds to his back and shoulder. The Camaro ended up crashing in the parking lot, and by that time, defendants' group had already fled the scene on foot. Christopher, Ruff and Jones retrieved Reyes from the Camaro and drove him to the hospital in the Sentra, but he died shortly after arrival.

*The Investigation*

Investigators found seven .40-caliber bullet casings in the area from which Metoyer had fired, and seven .45-caliber bullet casings in the area from which Johnson had fired. No guns or casings were found inside Reyes's Camaro or the Sentra.

Two days after the shooting, defendants were arrested at an apartment in Banning. During a search of the residence, the police found two handguns in the attic, a .40-caliber Beretta and a .38-caliber Ruger. Hoping to determine whether the Beretta was used in the shooting, investigators submitted the weapon to the crime lab, along with the bullet fragments that

5

were recovered from Reyes's body during his autopsy. But due to a lack of resources, the lab never analyzed those items. Thus, the prosecutor was forced to concede in closing argument that, "There's no way to prove which bullet killed [Reyes]. There's not even a way to prove which bullets struck [Reyes] or which bullets struck [Christopher]."

Within hours of the shooting, Metoyer posted a photo of himself and Johnson on his Facebook page along with a caption that read, "Keep a shooter to the left of me." Metoyer also made several incriminating statements during his jailhouse phone calls to his friends. In one of the calls, he told Jalin "it was me" when Jalin mentioned that one of them was going to have to kill someone sooner or later. And in another call, Metoyer threatened to "call hits" on Johnson—meaning have him killed—if he ratted on him.

Mall patron K.J. was in the parking lot when the shooting occurred. She testified she saw two young black men shooting at Reyes's Camaro at close range, after the vehicle had come to a stop. K.J. did not see the shooters' faces, but she believed one of them was wearing red and the other had "dreads or something." This was favorable testimony for the defense because neither Metoyer nor Johnson were wearing red or had dreadlocks at the time of the shooting.

However, K.J. also believed, mistakenly, the shooters were the ones who carried Reyes from the Camaro to the Sentra after the shooting. In truth, it was Ruff, Jones, and Christoper who did that. At that time, Ruff was wearing red, and Reyes had braided hair. The prosecutor argued that is why K.J.'s description of the shooters was off; she somehow conflated Ruff and Reyes with the shooters under the chaotic circumstances that followed the shooting.

*The Trial*

Defendants were tried for first degree murder and attempted premeditated murder, and Metoyer faced two additional charges of assault with a semiautomatic firearm. (Pen. Code, §§ 187, subd. (a), 189, subd. (a), 664, 245, subd. (b).)[3] As to Johnson, the sole theory of first degree murder was premeditation. But as to Metoyer, the jury was instructed it could find him guilty of that offense based on premeditation or the theory of lying in wait. The jury also was instructed on aiding and abetting principles. (CALCRIM Nos. 400, 401.) However, the trial court told the jury the aiding and abetting instructions applied only to Metoyer. Therefore, the only way the jury could convict Johnson was as a direct perpetrator of the alleged offenses.

In addition to the substantive counts, defendants also were charged with three gang enhancements. The first one alleged defendants acted for the benefit a criminal street gang pursuant to section 186.22, subdivision (b). The second one alleged a principal in the offenses discharged a firearm causing death or great bodily injury for the benefit of a criminal street gang. (§ 12022.53, subds. (d), (e).) And the third one alleged as a special circumstance that defendants committed the murder to further the activities of a criminal street gang. (§ 190.2, subd. (a)(22).)

Before trial, defendants moved to bifurcate all three gang enhancements from the substantive charges. Although the trial court granted the request as to the first gang enhancement, it refused to bifurcate the other two. Thus, as discussed more fully below, the jury heard a considerable amount of gang evidence in the trial on the underlying charges.

---

[3] Unless noted otherwise, all further statutory references are to the Penal Code.

In the end, the jury convicted defendants as charged and found all the gang allegations true. The trial court then found Johnson had suffered a prior serious felony conviction for purposes of section 667, subdivision (a) and the "Three Strikes" law, and Metoyer was on bail at the time of the shooting. The court sentenced Metoyer to life in prison without parole, plus an indeterminate term of 40 years to life and a determinate term of 18 years. Johnson received a sentence of life without parole, plus 55 years to life. This appeal followed.

## DISCUSSION

In their opening briefs, defendants each raised nine arguments, many of which are overlapping. In a separate filing, Johnson also joined some of the arguments put forth by Metoyer and explained how those particular arguments pertain to him. That timely filing allowed the Attorney General to respond to the joined arguments in one brief.

Metoyer, in contrast, made a vague request in his opening brief to join all of Johnson's claims "that may benefit him." Because Metoyer failed to explain which of Johnson's arguments he sought to adopt and why, his joinder request is insufficient for lack of specificity. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 [while joinder is broadly permitted, it is not satisfied by "cursory and unfocused statements" of joinder].) Although Metoyer did identify those arguments in his reply brief, by then it was too late for the Attorney General to respond to them. Therefore, we deem those arguments waived as to Metoyer. (*Hibernia Sav. and Loan Soc. v. Farnham* (1908) 153 Cal. 578, 584; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.)

## ALLEGED CHARGING ERROR

As to each defendant, the jury found true the allegation that they acted with premeditation in attempting to murder Christopher. Defendants claim those findings, as well as the life sentences they triggered, must be reversed because the prosecution charged them only with attempted murder, not attempted *premeditated* murder. We agree.

*A. Background*

This case was charged incorrectly from the very beginning. Instead of charging defendants with one count of murder and one count of attempted murder, the complaint mistakenly charged defendants with two counts of murder. To understand how that error permeated the proceedings, it is helpful to quote the initial charges directly from the complaint, which was filed on December 31, 2018.

Count one alleged defendants "committed a violation of Penal Code section 187, subdivision (a), a felony, in that on or about 12/24/2018, in the County of Riverside, State of California, the defendant(s) did willfully and unlawfully murder JOHN DOE N.R[.], a human being.v [25-L/L/D]." (*Sic.*) It is not clear what the "v" after human being stands for. It could have been a typo, but that odd notation appears throughout the charging documents, as shown below.

The record does not explain what "[25-L/L/D]" means either. However, given that defendants were charged with a special circumstances allegation, it could have been intended to signify they were facing potential sentence of 25 years to life, life in prison without parole, or the death penalty if they were convicted of first degree murder. (See § 190, subd. (a).)

Count two of the complaint charged defendants with murder in the identical language that was used in count one, except the victim in count two was identified as Christopher, the victim who survived the shooting. In particular, count two alleged defendants "committed a violation of Penal Code section 187, subdivision (a), a felony, in that on or about 12/24/2018, in the County of Riverside, State of California, the defendant(s) did willfully and unlawfully murder JOHN DOE J.C., a human being.v [25-L/L/D]." (*Sic.*)

The preliminary hearing was held on October 14, 2020, with both defendants present and represented by counsel. After the prosecutor finished presenting his evidence, Johnson's attorney stated, "I believe there's a typographical error in count two." The prosecutor responded by asking the court to amend that count to allege attempted murder, instead of murder. Hearing no objection from defense counsel, the court granted the request. The court then asked the prosecutor if he wanted count two to allege the attempted murder was "willful, deliberate, and premeditated." The prosecutor said he did, so the court announced, "That will be included as well."[4]

Defense counsel did not object to that amendment. However, Johnson's attorney did argue there was insufficient evidence to bind over his client on the new charge of attempted premeditated murder because, in his view, the shooting was "a spontaneous action that was triggered by foolishness, not premeditated . . . ." The trial court disagreed and held defendants to answer on the amended charges.

---

[4] The trial court said these amendments were being made by interlineation, which implies he expected the prosecutor to follow up by amending the complaint by hand to signify it had been changed to include the new charge of attempted premeditated murder in count two. However, that never happened.

Nonetheless, when the prosecution filed the subsequent information, it did not include a premeditation allegation with respect to the attempted murder charge in count two. Instead, the prosecution simply alleged "a violation of Penal Code section 664/187, subdivision (a), a felony, in that on or about 12/24/2018, in the County of Riverside, State of California, the defendant(s) did willfully and unlawfully attempt to murder JOHN DOE (J.C.), a human being.v [25- L/L/D]." (*Sic*.)

The first amended information, which was filed over a year later, on February 22, 2022, contained identical language in count two. Like the original information, it did not allege the attempted murder of Christopher was premeditated.

Subsequent filings by the prosecution likewise omitted any mention of premeditation in describing count two. In fact, in both its opposition to defendants' section 995 motion to dismiss and in its trial brief, the prosecution described count two simply as attempted murder in violation of sections 187 and 664.

Toward the end of the prosecution's case, the parties submitted their requests for jury instructions. As relevant here, the prosecutor and counsel for both defendants requested CALCRIM No. 601. That instruction applies when the defendant is charged with attempted murder and the prosecution further alleges the crime was done "willfully, and with premeditation and deliberation." (CALCRIM No. 601.)

When the evidentiary phase of the trial ended a few days later, the judge informed the parties he was in the process of finalizing the jury instructions. He said he would make his proposed instructions available to counsel that evening, and if they had any issues regarding them or any

11

suggested corrections, they should email his clerk or let him know within the next few days.

The following day, the judge met with counsel on the record to discuss the jury instructions. With regard to CALCRIM No. 601—which, as noted above, describes the elements of attempted premeditated murder—the judge said he intended to give that instruction as requested by the parties. The judge also encouraged the parties to keep reviewing his proposed instructions and to let him know if they spotted any potential problems with them.

When court convened the next morning, the judge stated he had received an email from Johnson's attorney in response to his invitation for feedback on the proposed jury instructions. In the email, Johnson's attorney indicated that, because there was no premeditation allegation in the information with respect to the attempted murder charge, he had been working under the assumption that the prosecution was not alleging premeditation as to that offense. Therefore, CALCRIM No. 601 should not be given to the jury after all.

When the judge asked the prosecutor about that, he analogized attempted murder to the crime of murder. Noting the prosecution is not required to allege premeditation to pursue a conviction for first degree murder, the prosecution implied the same rule should apply to attempted murder. In response, Johnson's attorney correctly pointed out that, unlike murder, the crime of attempted murder is not divided into degrees. He also acknowledged the prosecution would have had the right to pursue a conviction for attempted premeditated murder against his client if it had included a premeditation allegation in the information. However, because the prosecution failed to do so, he argued premeditation was off the table as far

12

as the attempted murder charge was concerned, and the judge therefore should not give CALCRIM No. 601 to the jury. Metoyer's attorney agreed.

The prosecutor did not respond to this argument. Rather, he simply submitted the matter for the trial judge's consideration. Although the judge acknowledged the crime of attempted murder is not divided into degrees, he said, "I don't think that there's any insufficiency of pleading. I see this all the time. And again, as I mentioned [when] it's murder, . . . the jury decides if it's first degree or second degree. Here it's attempt[ed] murder, and the jury decides whether it's with or without premeditation and deliberation. That's just how it's typically pled . . . ."

With that said, the judge overruled defense counsels' joint objection to CALCRIM No. 601, and, per that instruction, the jurors were informed of the elements of willful, deliberate, and premeditated attempted murder. They also were presented with a special verdict form, asking them whether the attempted murder of Christopher was premeditated. Ultimately, the jury answered that question in the affirmative, and in light of that finding, the trial court was required to sentence defendants to life terms on the attempted murder count.

B. *Analysis*

The defendants' challenge to their attempted premeditated murder convictions and their resulting life sentences is based on section 664. Under that provision, the punishment for an attempted crime is generally half of that prescribed for the completed offense. (§ 664, subd. (a).) "However, if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. If the crime attempted is any other one in which the maximum sentence is life

13

imprisonment or death [e.g., nonpremeditated murder], the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years." (*Ibid.*)

Section 664 also contains a pleading requirement when the prosecution is pursuing charges of attempted premeditated murder. It states, "The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664, subd. (a).)

In enacting this pleading requirement, the Legislature recognized criminal defendants have "a due process right to fair notice of the allegations that will be invoked to increase the punishment for his or her crimes." (*People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*).) More particularly, the pleading requirement in section 664 is intended to ensure the defendant knows he is facing an allegation of premeditation that, if found true, would increase his punishment for attempted murder from a maximum term of nine years to a life sentence. (See *People v. Bright* (1996) 12 Cal.4th 652, overruled on other grounds in *People v. Seel* (2004) 34 Cal.4th 535, 550 fn. 6.) It also allows the defendant "to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial." (*People v. Anderson* (2020) 9 Cal.5th 946, 964.)

These considerations underscore the importance of providing the defendant with fair notice of the charges he is facing, including any allegations that could enhance his base sentence. In this regard, it is important to keep in mind "it is the People's burden to properly plead

14

enhancement allegations, not the defendant's responsibility to ferret them out." (*People v. Sawyers* (2017) 15 Cal.App.5th 713, 727.)

To his credit, the Attorney General concedes the information did not comply with section 664's pleading requirement and the trial court erred in concluding the prosecution was not required to allege the attempted murder was committed with premeditation and deliberation. However, the Attorney General maintains defendants forfeited their right to complain about the pleading deficiency by initially asking the court to instruct the jury on attempted premeditated murder per CALCRIM No. 601. The state also argues defendants had adequate notice they were facing charges of attempted premeditated murder and the punishment associated with that aggravated offense.

In support of these interrelated arguments, the Attorney General relies on a variety of circumstances, including the fact the original complaint was orally amended at the preliminary hearing to include the charge of attempted premeditated murder. However, during the amendment process, the prosecutor initially requested only the charge of attempted murder. It was only after the trial court asked about premeditation that the prosecutor sought to include that allegation in the complaint. Even then, the prosecutor did not actually amend the complaint by interlineation, which is typically done following an oral amendment.

Moreover, despite that oral amendment, the prosecution did not subsequently allege the attempted murder was premeditated, in either the original or the first amended information. This is significant because those charging instruments superseded the complaint and became the operative documents for purposes of informing defendants of the charges they were facing. (See *Garcia v. Superior Court* (2020) 47 Cal.App.5th 631, 647; *People*

15

*v. Scott* (2013) 221 Cal.App.4th 525, 533; *People v. Mack* (1961) 197 Cal.App.2d 574, 578.)

The prosecution also did not include premeditation in their description of the attempted murder charge in their motion papers or trial brief. Instead, it repeatedly characterized the charge as simple attempted murder. In light of these circumstances, defendants were "entitled to assume the prosecution made a discretionary choice not to pursue [a premeditation allegation with respect to that charge] and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial." (*People v. Anderson, supra,* 9 Cal.5th at p. 956; accord, *People v. Mancebo* (2002) 27 Cal.4th 735, 749–751.)

Even so, the Attorney General argues defendants forfeited their right to complain about the lack of notice regarding the premeditation element because they initially requested jury instructions on attempted premeditated murder, pursuant to CALCRIM No. 601. The Attorney General interprets this request as a sign defendants acquiesced to the more aggravated form of attempted murder as part of the charges.

Although both the prosecution and defense counsel initially flagged CALCRIM No. 601 for inclusion in the jury instruction packet while the prosecution evidence was still being presented, the court made clear it would be working on the instructions and they were not final. When the court later provided counsel its proposed set of instructions, it invited all parties to review the instructions and to advise the court if they had any issues or concerns with any of them. The next day, when the court indicated it proposed to give CALCRIM No. 601, it again encouraged the parties to continue reviewing the instructions and to let it know of any objections or concerns. And defendants' counsel did exactly what the court directed. With

16

the benefit of additional time to evaluate the set of instructions proposed by the court, defense counsel explicitly objected to the inclusion of CALCRIM No. 601 and made clear the reasons for their objection. As a result, both the prosecutor and the court had ample opportunity to consider and respond to defense counsels' arguments before the court made its final ruling on the jury instructions. On these facts, we cannot fairly construe defense counsels' conduct as a waiver or forfeiture of their objection to the instruction.

Moreover, the record does not support any suggestion of gamesmanship by defense counsel in the handling of CALCRIM No. 601. This is not a case where defense counsel sat on their hands at trial and waited until the appeal to surprise the state with a new theory or argument they were holding back to gain an unfair advantage in the proceedings. (See generally *People v. Arredondo* (2019) 8 Cal.5th 694, 710 [the reason for the forfeiture rule "is to allow the trial court to correct its errors and 'to prevent gamesmanship by the defense'"].)

The factual circumstances presented here are markedly different from those in *Houston, supra,* 54 Cal.4th 1186 on which the Attorney General relies for his forfeiture argument. In *Houston*, the information did not comply with section 664's pleading requirement, but during the defense case, the trial court informed the defendant it was proceeding on the understanding the prosecution intended to charge him with attempted premeditated murder. (*Houston,* at p. 1226.) The court also informed the defendant that, if the premeditation allegation were found true, it would elevate his potential punishment from a maximum term of nine years to life in prison. (*Ibid*.) Yet, despite being invited to do so, the defendant did not object to that prospect at that time or at any other point during the course of the proceedings. (*Ibid*.)

On those facts, our Supreme Court found the defendant forfeited his right to challenge the jury's premeditation finding on the basis the charging documents did not allege the attempted murder was premeditated. (*Houston, supra,* 54 Cal.4th at pp. 1228–1229.) The Court also determined the defendant received sufficient notice of the premeditation charge because the trial court specifically informed him of that charge and the possible sentencing consequences it could entail. (*Ibid.*)

Here, in contrast, defense counsel strenuously objected once they realized the prosecution was actually going to pursue a conviction for attempted premeditated murder. They did not sit silently by as the trial court prepared jury instructions and jury verdicts on the premeditation element, as the defendant did in *Houston, supra*, 54 Cal.4th 1186. Therefore, their notice argument has not been forfeited.

*Houston* is also distinguishable in terms of the nature of the notice the defendant received. Unlike the defendant in *Houston*, *supra*, 54 Cal.4th 1186, the defendants in this case were never informed that attempted premeditated murder carried a possible life sentence. The Attorney General argues this was reasonably inferable from the "[25-L/L/D]" notation that was included in the attempted murder charge in count two of the amended information. But even if we assumed defendants could reasonably be expected to divine that the "L" in that notation was intended to signify a possible life term, the notation as a whole did not properly reflect the correct sentencing range for attempted premeditated murder. Rather, it reflected the sentencing range for special circumstances murder, as charged in count one. Given that the defendants originally were mischarged with murder in count two, it appears the "[25-L/L/D]" notation in that count was simply an unintended leftover from that original charging error. The prosecution's

18

cryptic notation cannot be said to have reasonably or fairly apprised defendants that they were facing the charge of attempted *premeditated* murder.

For all of these reasons, we conclude the jury's true findings on the premeditation allegation in count two—and the increased punishment associated with those findings—must be reversed.

II.

SUFFICIENCY OF THE EVIDENCE TO SUPPORT

JOHNSON'S MURDER CONVICTION

Johnson argues there is insufficient evidence to support the jury's finding he murdered Reyes. In so arguing, Johnson does not dispute he repeatedly fired at Reyes with malicious intent. However, he claims his murder conviction must be reversed because there is insufficient evidence to support the only theory of causation that was submitted to the jury. We find the claim well taken.

A. *Background*

As noted above, Johnson and Metoyer were both charged with first degree murder for shooting at Reyes, but the prosecution was unable to prove which shot or shots caused Reyes's death. In recognition of this fact, the prosecution asked the trial court to instruct the jury on both the "direct" theory of causation and the "substantial factor" theory of causation. Those two theories are set forth in bracketed paragraphs of CALCRIM No. 520, which defines the crime of murder.

The first bracketed paragraph states an act "causes death if the death is the direct, natural, and probable consequence of the [act] and the death would not have happened without the" act. (CALCRIM No. 520.) The second bracketed paragraph provides, "There may be more than one cause of

19

death. [An act] causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (*Ibid*.)

Like the prosecutor, the defense attorneys and the trial judge believed that both of these bracketed paragraphs were potentially applicable in this case. But, due to inadvertence, the written version of CALCRIM No. 520 that was read and provided to the jurors contained only the first bracketed paragraph on direct causation. It did not contain the second bracketed paragraph on the substantial factor theory. Thus, the jury was instructed only on the direct theory of causation.

During his closing argument, however, the prosecutor proceeded on the assumption the jury had been instructed on both theories. He first addressed the direct theory of causation, arguing the defendants were liable for murder because they both shot at Reyes and caused his death. Then the prosecutor segued into the substantial factor theory and argued defendants were liable for murder because their conduct was more than a trivial or remote factor in Reyes's death. Neither argument drew an objection because, like the prosecutor, defense counsel apparently assumed—albeit incorrectly— the jury had been instructed on both the direct and the substantial factor theories of causation.

That left the jurors in a quandary during deliberations. On the one hand, they had been instructed to follow the law as provided by the trial judge, not the attorneys. (CALCRIM No. 200) On the other hand, the sole theory of causation on which they had been instructed—direct causation—did not fit the evidence because, as the prosecutor acknowledged, he was unable to prove which shot or shots killed Reyes. This was particularly troublesome as to Johnson because he was prosecuted as the actual perpetrator of the

20

charged offenses, not as an aider and abettor. The only way the jury could find him guilty of murder was if the prosecution proved beyond a reasonable doubt that he personally and directly caused Reyes's death. Yet the prosecutor candidly admitted during his closing argument he was unable to do that.

Faced with this situation, the jurors sent the trial judge a note asking why the instructions on aiding and abetting applied only to Metoyer. They wanted to know if they could apply those instructions to Johnson, as well. When the judge met with counsel to discuss these inquiries, they still did not realize the jury had not been instructed on the substantial factor theory. We know this because when the prosecutor addressed the jury's note, he referenced that theory in urging the judge to allow the jury to consider the aiding and abetting instructions as to Johnson. While acknowledging he had not requested that earlier, the prosecutor argued it was important for the jury to have the aiding and abetting option as to Johnson because the jury may not have believed his actions were a substantial factor in Reyes's death. After all, Johnson did not fire his gun until Metoyer had already fired several shots, and when he did, he was positioned farther away from Reyes than Metoyer was.

However, the trial judge was skeptical whether there was sufficient evidence for the jury to find Johnson guilty as an aider and abettor. He also expressed fairness concerns about instructing the jury on a new theory of liability as to Johnson in the middle of the jury's deliberations. Ultimately, the judge decided to tell the jury, consistent with his original instructions, the aiding and abetting instructions applied only to Metoyer, and not to Johnson. Thus, the only way the jury could have convicted Johnson of murder was if he personally and directly caused Reyes's death.

21

*B. Analysis*

Johnson argues there is insufficient evidence to support such a finding, and he is right. Although the standard of review in assessing the sufficiency of the evidence to support a criminal conviction is highly deferential (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538), there is not substantial evidence to support Johnson's murder conviction on the sole theory of causation on which the jury was instructed. In fact, the Attorney General impliedly concedes this; he makes no attempt to justify Johnson's murder conviction under the direct theory of causation that was provided to the jury. Instead, he tries to salvage the conviction on the basis it resulted from a harmless instructional error, i.e., the inadvertent failure to instruct the jury on the substantial factor theory of causation. For the reasons explained below, we cannot agree.

As the parties and the trial judge recognized below, there was sufficient evidence to support instructions on the substantial factor theory of causation. Under that theory, "'""When the conduct of two or more persons *contributes concurrently as the proximate cause of the death*, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death."'" [Citation.]' [Citations.] 'To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.' [Citation.] '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

Consistent with these principles, a defendant may be lawfully convicted of first degree murder under the substantial factor theory of causation for engaging in a gang-related shootout involving multiple persons, even when it is unclear who fired the fatal shot or shots. (*People v. Sanchez* (2001) 26 Cal.4th 834, 845–849.) It is equally well established, however, that appellate courts "cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule." (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.) In other words, in reviewing the record for substantial evidence, we cannot uphold a criminal conviction "on the basis of a theory not presented to the jury." (*Chiarella v. United States* (1980) 445 U.S. 222, 236; *People v. Garcia* (2014) 224 Cal.App.4th 519, 525; *People v. Beaver* (2010) 186 Cal.App.4th 107, 125; *People v. Curtin* (1994) 22 Cal.App.4th 528, 531.)

Nevertheless, because the record in this case contains ample evidence to support the substantial factor theory of causation, and because the prosecutor argued that theory to the jury in closing argument, the Attorney General claims the failure to instruct on it was harmless error. This claim fails for three reasons.

First, "in a criminal case a defendant is constitutionally entitled to have the issue of criminal liability determined by a jury in the first instance." (*McCormick v. United States* (1991) 500 U.S. 257, 270, fn. 8.) "Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury." (*Id.* at pp. 270–271, fn. 8; *People v. Pennington* (2017) 3 Cal.5th 786, 800) Rather, due process requires substantial evidence to support the particular theory on which the jury was actually instructed. (See *People v. Smith* (1984) 155 Cal.App.3d 1103, 1145 [affirming a criminal

23

conviction on a theory on which the jury was not instructed would undermine the defendant's constitutional right to a jury trial], disapproved on other grounds in *Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832–835.)

Second, and relatedly, the arguments of counsel cannot substitute for proper instruction by the trial court. (*Taylor v. Kennedy* (1978) 436 U.S. 478, 488–489.) "While we have no trouble utilizing the argument of counsel to help clear up *ambiguities* in instructions given, there is no authority which permits us to use argument *as a substitute for* instructions that should have been given." (*People v. Miller* (1996) 46 Cal.App.4th 412, 426, fn. 6, disapproved on another ground in *People v. Cortez* (1998) 18 Cal.4th 1223, 1240; accord, *Morales v. Woodford* (9th Cir. 2004) 388 F.3d 1159, 1170.) Therefore, in the absence of instructions on the substantial factor theory of causation, it is immaterial the prosecutor argued that theory to the jury during his closing argument. (See generally *United States v. Escobar de Bright* (9th Cir. 1984) 742 F.2d 1196, 1201 [unless the jury receives particular instructions on a given legal theory, evidence and argument thereon have little value because jurors must follow the law as provided to them by the trial court; they are "not free to conjure up the law for themselves"].)

Third, the lone decision cited by the Attorney General in support of his harmless error argument, *People v. Cornejo*, (2016) 3 Cal.App.5th 36 (*Cornejo*), is clearly distinguishable from this case. In *Cornejo*, the jury was not instructed on the substantial factor theory of causation set forth in CALCRIM No. 520. However, the substance of that theory was covered by another instruction that was given to the jury. (*Cornejo,* at pp. 60–61.) Under those circumstances, the *Cornejo* court found any error in failing to give the

24

substantial factor language from CALCRIM No. 520 "was manifestly harmless under any standard of prejudice." (*Cornejo,* at p. 62.)

Here, however, the jury was not given a suitable substitute for the substantial factor theory of causation in CALCRIM No. 520. In fact, it was not given *any* instructions on that theory. Therefore, the harmless error analysis in *Cornejo, supra,* 3 Cal.App.5th 36 is inapt.

Moreover, although the prosecutor pitched the substantial factor theory of causation to the jury during his closing argument, the evidence in support of that theory was far from overwhelming. Indeed, the prosecutor recognized as much during the discussion about the jury's request to apply the aiding and abetting instructions as to Johnson. One of the reasons the prosecutor suggested the trial court grant the jury's request is because he feared the jury might find the evidence insufficient to convict Johnson of murder under the substantial factor theory of causation.

Irrespective of the strength of the evidence to support that theory, as a matter of due process and fundamental fairness, Johnson was entitled to have the jurors assess his culpability for murder based on the instructions they were given. Therefore, it only makes sense that we limit our sufficiency-of-the-evidence analysis to the legal theories encompassed within those instructions; we "cannot look to legal theories [that were] not before the jury." (*People v. Kunkin, supra*, 9 Cal.3d at p. 251.)

As to the charge of murder, the sole theory of causation on which the jury was instructed was the direct theory set forth in the first bracketed paragraph of CALCRIM No. 520. Because the record lacks substantial evidence to support Johnson's murder conviction under that theory, his murder conviction cannot stand, and the jury's true findings on the enhancement allegations attached to the murder charge also must be

reversed. (See *Oxendine v. State* (Del. 1987) 528 A.2d 870 [even if there were sufficient evidence to support the defendant's manslaughter conviction on some of the causation theories initially contemplated by the prosecution, reversal was required because the jury was not instructed on those theories, and there was insufficient evidence to support the only theory of causation on which the jury was instructed].)[5]

### III.

### THE GANG EVIDENCE

Defendants contend the trial court mishandled the gang evidence by (1) not bifurcating all the gang allegations from the underlying charges, (2) permitting the introduction of improper predicate offenses, and (3) failing to exclude more of the evidence under Evidence Code section 352. We disagree across the board.

*A. Background*

Before trial, defendants moved to bifurcate all three gang enhancement allegations pursuant to section 1109. They did not want the jury to hear any gang evidence until it had adjudicated the truth of the underlying charges. However, based on the plain language of the statute, the trial court ruled section 1109 applied only to the enhancement allegation

---

[5] Given this conclusion, we need not consider Johnson's alternative arguments that his murder conviction must be reversed because the trial court failed to instruct on the lesser included offense of attempted murder and the court improperly allowed the jury to determine the degree of murder based on his own statements. We also offer no opinion on whether retrying Johnson for murder under the substantial factor theory of causation would violate double jeopardy principles. (See generally *Saylor v. Cornelius* (6th Cir. 1988) 845 F.2d 1401 [discussing the constitutional implications of retrying a defendant on a different theory of culpability following a reversal for insufficient evidence and/or instructional error].)

26

defendants were facing under section 186.22, subdivision (b)—i.e., defendants acted for the benefit of a criminal street gang. Therefore, although the court bifurcated that allegation, it denied defendants' request to bifurcate the gang firearm allegation (§ 12022.53, subds. (d), (e)) and the gang special circumstances allegation (§ 190.2, subd. (a)(22)).

Consequently, the prosecution was permitted to introduce a wide array of gang evidence in the trial on the underlying charges. That evidence included several photographs and videos of the defendants posing with guns. The prosecution also presented evidence of various crimes defendants and their fellow Edgemont gang members had committed in the past. As discussed more fully below, this evidence was offered to prove defendants were members of Edgemont, the nature of the crimes the gang committed, and the gang constituted a criminal street gang for purposes of the gang enhancement allegations.

To that same end, the prosecution presented testimony from a gang expert who testified Edgemont's primary activities include illegal firearms possession, drug sales, robbery, burglary, carjacking, assault, and homicide. The expert also opined the charged offenses benefited Edgemont because they were aimed at members of a rival gang. Indeed, he stated the most effective way for gang members to gain respect is to carry out violent crimes against their enemies.

B. *Bifurcation under Section 1109*

As relevant here, section 1109 provides, "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense

27

and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. . . ." (§ 1109, subd. (a).)

This provision was intended to reduce the harmful and prejudicial impact of gang evidence, which has the potential to lead to wrongful convictions. (*People v. Burgos* (2024) 16 Cal.5th 1, 10.) Defendants contend this objective would be undermined if the statute did not apply to all gang enhancements, no matter what section they were charged under. On its face, however, section 1109 applies only when "a gang enhancement is charged under subdivision (b) or (d) of Section 186.22." (§ 1109, subd. (a).) It does not mention the gang firearm enhancement in section 12022.53, the gang special circumstance in section 190.2, or any other gang enhancement for that matter.

This is significant because the Legislature "'is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof.'" (*People v. Yartz* (2005) 37 Cal.4th 529, 538.) Had the Legislature intended to include sections 12022.53 or 190.2 within the scope of section 1109, it easily could have done so, but it did not. "'We may not rewrite [a] statute to conform to an assumed intention that does not appear in its language'" (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 807), and "[w]e cannot add words to a clear and unequivocal statute" (*Figueroa v. FCA US, LLC* (2022) 84 Cal.App.5th 708, 712).

Section 1109 is clear on its face: It only required the bifurcation of the gang enhancement that was charged against defendants under section 186.22, subdivision (b). The trial court therefore did not err by failing to bifurcate the other gang enhancement allegations. (*People v. Superior Court (Farley)* (2024) 100 Cal.App.5th 315, 324; *People v. Oliva* (2023) 89

28

Cal.App.5th 76, 92; *People v. Montano* (2022) 80 Cal.App.5th 82, 111–114, disapproved on other grounds in *People v. Burgos, supra,* 16 Cal.5th 1.)

*C. The Nature of the Predicate Offenses*

To prove defendants' gang constituted a criminal street gang for purposes of the gang enhancement allegations, the prosecution had to establish, inter alia, the gang's members have collectively engaged in "a pattern of criminal gang activity." (§ 186.22, subd. (f).) As part of that pattern requirement, the prosecution had to show the members of defendants' gang committed two or more statutorily enumerated crimes, known as predicate offenses, before the current case arose. (*Id*., subds. (e)(1), (2); *People v. Navarro* (2021) 12 Cal.5th 285, 311.) As relevant here, the prosecution also had to prove those predicate offenses "were committed on separate occasions or by two or more members" of defendants' gang. (§ 186.22, subd. (e)(1).)

In their trial brief, the prosecution identified six predicate offenses it intended to prove at trial. However, citing Evidence Code section 352, the court excluded two of those offenses as cumulative. Therefore, the prosecution ended up providing evidence of only four predicate offenses to the jury.

The first predicate offense was unlawful possession of a firearm by Metoyer in November 2018. The police found the firearm in a car in which Metoyer had been smoking marijuana with Jalin and another person. When asked about the gun, Metoyer said he had it "for protection."

The second predicate offense occurred on September 24, 2017. That day, Johnson and an accomplice carjacked a man at gunpoint while he was sitting in his car in the parking lot of a coffee shop in Palm Desert.

The third predicate offense was a robbery by Edgemont gang members at a Moreno Valley house party in September 2017. Metoyer was

29

detained as a suspect in the crime, but he was not charged in connection with that incident.

The fourth and final predicate offense involved a shooting at a smoke shop in Edgemont territory in February 2016. Two of defendants' fellow gang members pleaded guilty to attempted murder for their role in the shooting.

In addition to presenting evidence on these four predicate offenses, the prosecution also presented evidence of several other offenses committed by Edgemont members before this case arose, including a gun theft by Johnson and instances of drug selling and making criminal threats by Metoyer. Pointing to these nonpredicate offenses, defendants argue they were insufficient to prove the pattern requirement because they were committed by individual members of their gang, and not by two or more members thereof.

In so arguing, defendants conflate the nonpredicate offenses with the predicate offenses, which is why at oral argument counsel for Metoyer placed the number of predicate offenses as high as 12. However, the prosecution did not rely on any nonpredicate offenses to prove the pattern requirement. Instead, as explained above, it relied on the four predicate offenses that were the subject of the court's pretrial ruling, all of which were committed by multiple members of defendants' gang. So, even if the pattern requirement necessitated proof the predicate offenses were committed by multiple gang members, defendants' argument still would not carry the day.

As it turns out, though, we now know such proof is not required. Following the opening round of briefing in this case, our Supreme Court ruled the pattern requirement does not require proof the predicate offenses were committed by two or more members of the defendant's gang. (*People v. Clark*

(2024) 15 Cal.5th 743, 751–757.) Rather, it merely requires the prosecution to demonstrate a nexus between the predicate offenses and the gang as a collective unit. (*Id*. at pp. 757–762.) "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles." (*Id*. at p. 762.)

In his reply brief, Metoyer argues this organizational nexus was lacking as to two of the predicate offenses the prosecution relied on at trial, the illegal gun possession by Metoyer and the carjacking by Johnson.[6] However, the prosecution's gang expert testified illegal gun possession and carjacking are two of the primary activities of defendants' gang. He also testified the commission of such crimes benefits the gang by allowing its members to defend themselves, instill fear in others, and generate revenue to help the gang carry out its illegal activities. This evidence was relevant and sufficient to establish the nexus between the predicate offenses and the collective organization of defendants' gang. (Compare *People v. Lamb* (2024) 16 Cal.5th 400, 451 [expert testimony about how gangs generally benefit from committing crimes was insufficient to establish nexus requirement].) Therefore, the trial court did not error in admitting it into evidence for purposes of proving the gang enhancement allegations.

---

[6] Metoyer also claims the requisite nexus was lacking as to other, nonpredicate offenses, but because those offenses were not used to prove the pattern requirement, they are immaterial to our analysis.

*D. Evidence Code Section 352*

Defendants further maintain the bulk of the gang evidence should have been excluded because it was unduly prejudicial under Evidence Code section 352 and violated their right to due process of law. Again, we disagree.

Under Evidence Code section 352, the trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Because this weighing process is discretionary in nature, our review of Evidence Code section 352 rulings is "highly deferential." (*People v. Parker* (2022) 13 Cal.5th 1, 39.) We will not disturb a ruling under that section unless the trial court abused its discretion by acting in an arbitrary, capricious, or patently absurd manner that resulted in a clear miscarriage of justice. (*Ibid.*)

No such abuse occurred in this case. The gang evidence at defendants' trial was plentiful, to be sure. However, it also was highly relevant to both the underlying charges and the gang enhancement allegations. In fact, as discussed above, those allegations required proof of prior predicate offenses by defendants' gang. Defendants complain the trial court allowed the prosecution to introduce evidence of four predicate offenses when the gang allegations only required proof of two such offenses. (§ 186.22, subds. (e)(1), (2).) But, in the interest of fairness, the court excluded evidence of two other predicate offenses the prosecution was prepared to establish. The court clearly was cognizant of the cumulative impact such evidence could have on the jury.

32

As noted above, the prosecution also introduced evidence of several nonpredicate offenses defendants committed before the instant case arose, including theft, drug selling, and making criminal threats. Defendants assert this evidence was immaterial and excessive. To the contrary, it was relevant to prove defendants' membership in, and loyalty to, Edgemont, which were crucial to establish a motive for the shooting. Indeed, without the gang evidence, the jury would have been left to guess why defendants' group confronted the victims in the first place and ultimately opened fire on them without any provocation. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [recognizing that gang evidence is often relevant and admissible to prove the defendant's motive for committing the charged offense]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 [same]; compare *People v. Garcia* (2024) 107 Cal.App.5th 1040, 1047–1059 [admission of voluminous gang evidence deemed improper because it was largely irrelevant to any of the issues in the case and it contravened the trial court's bifurcation order].)

And, in terms of prejudice, the gang evidence was generally less inflammatory than the facts surrounding the violent crimes defendants were accused of committing in this case, which is an important factor in our analysis. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211.) Because the gang evidence was highly relevant and no more incendiary than the charged offenses, we discern no abuse of discretion in its admission.

Nor did the gang evidence violate defendants' due process rights. (See generally *Andrew v. White* (2025) 604 U.S. __ [145 S.Ct. 75, 220 L.Ed.2d 340] [the erroneous admission of prejudicial evidence may violate due process in rare cases].) The evidence may have been prejudicial in the sense it was harmful to the defense, but it was not so uniquely damaging that it rendered

33

defendants' trial fundamentally unfair. (Compare *People v. Albarran* (2007) 149 Cal.App.4th 214 [evidence linking the defendant and his gang to the Mexican Mafia was unfair because it was used to inflame the jury and show the defendant's disposition for violent criminal activity].) Therefore, the gang evidence is not cause for reversal.[7]

---

[7] In a supplemental letter brief filed before oral argument, Metoyer's attorney stated she intended to discuss *People v. Hin* (2025) 17 Cal.5th 401 during her argument. Although that intention went unfulfilled, we presume counsel brought this 145-page death penalty case to our attention because the Supreme Court there found the introduction of certain graphic and violent rap lyrics constituted an abuse of discretion under Evidence Code section 352. In so finding, however, the Supreme Court emphasized the lyrics did not relate to or describe any of the charged offenses against the defendant. Moreover, the Supreme Court ultimately found the erroneous admission of the lyrics harmless given the overwhelming evidence of the defendant's guilt. (*People v. Hin, supra*, at pp. 471-483.)

Here, the prosecution did present evidence regarding a rap video made by Christopher after the shooting. However, the lyrics of the song related to the charged crimes, which made them significantly more relevant than the lyrics in *Hin*. And some of the lyrics were even favorable to the defense, insofar as they painted Reyes as an unsympathetic victim. In light of these circumstances, and because the evidence of defendants' guilt was compelling, it is not reasonably likely defendants would have obtained a more favorable result had the rap video evidence been excluded at trial. Therefore, as in the *Hin* case, any error in its admission was harmless.

IV.

THE EXCLUSION OF REYES'S GUN PHOTOS

Defendants contend the trial court erred by excluding various photographs depicting Reyes with guns.[8] They argue that, beyond constituting an abuse of discretion, the court's decision violated their right to present a defense and to due process of law. We uphold the decision as a proper exercise of judicial discretion.

*A. Background*

During a pretrial hearing on the matter, Metoyer's attorney said he wanted to use the gun photos to develop a theory of self-defense. To support this theory, defense counsel relied on the facts Metoyer and Reyes belonged to rival gangs, and Metoyer was holding a gun on Ruff and Jones when Reyes arrived on the scene in his Camaro. Defense counsel argued that, under these circumstances, Metoyer had every reason to believe that if he did not shoot Reyes, Reyes might try to run him over or shoot him to protect his fellow gang members. Counsel believed the gun photos would bolster this theory by showing Reyes had a propensity for armed violence.

The trial court was not persuaded. As a foundational matter, it determined the photos of Reyes with guns would not be relevant unless the defense presented evidence Reyes actually had a gun with him on the night in question and he made the weapon apparent to defendants before they shot him. Otherwise, the photos would be misleading and unduly prejudicial by suggesting something that was not borne out by evidence, i.e., that Reyes was

---

[8] In one of the subject photos, Reyes is holding a gun while posing with other gang members, and in the others, he is pointing a gun or guns directly at the camera. There is no indication of when, where, or the circumstances under which the photos were taken.

35

armed at the time of the shooting. The court therefore tentatively excluded the photos.

Later, during the trial, Metoyer's attorney renewed his request to admit the gun photos, and Johnson's attorney joined the request. They argued the photos supported their theory Reyes was a violent gang member who was acting as the aggressor when defendants shot at him. But because there was no evidence showing Reyes was armed at the time of the shooting, the trial court stuck to its tentative ruling and excluded the photos as misleading and prejudicial.

*B. Analysis*

Although character evidence generally is inadmissible to prove a person's conduct on a particular occasion (Evid. Code, § 1101, subd. (a)), "Evidence Code section 1103, subdivision (a)(1) provides an exception . . . when a defendant offers evidence regarding the character or trait of a victim 'to prove conduct of the victim in conformity with the character or trait of character.' Of course, the trial court may exclude otherwise admissible evidence pursuant to Evidence Code section 352 if [it determines that] admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828.) In making this determination, the trial court may rightfully consider the similarity (or lack thereof) between the character trait sought to be established by the proffered evidence and the particular conduct at issue in the trial. (*People v. Wright* (1985) 39 Cal.3d 576, 587–588.)

Here, the character trait sought to be proven by the gun photos was Reyes's claimed propensity for armed violence. But there was no evidence Reyes had a gun with him when he entered the parking lot, let alone

36

that he was aiming a gun at defendants when they shot at him. In fact, Reyes's passenger, Christopher, testified he and Reyes were both unarmed that night. And K.J., the sole neutral witness to the shooting, testified she did not see Reyes or Christopher shooting during the encounter.

Moreover, no firearms or bullet casings were found in Reyes's Camaro after the shooting. Defendants surmise Christopher may have taken a gun from the Camaro while he was helping Jones and Ruff transport Reyes from that car to the Sentra after the shooting. However, that is pure speculation. Although the surveillance videos show Christopher made several trips between the cars after Reyes was shot, there is no indication from the videos that he obtained a gun from the Camaro during that time, or that he or Reyes had any weapons at the time of the shooting. Absent an evidentiary basis for defendants' theory that Reyes was armed, we cannot say the trial court abused its discretion in excluding the photos of him with guns. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 728.)

Equally unpersuasive is defendants' argument the photos of Reyes with guns were admissible because they "tended to prove he had a habit or custom of carrying guns, making it more likely he had a gun on him during the charged shooting." To be admissible as habit evidence, the evidence must demonstrate "'a person's regular or consistent response to a repeated situation.'" (*People v. Memro* (1985) 38 Cal.3d 658, 681, fn. 22, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181.) But, as we have noted, the date, location, and circumstances under which the subject photos were taken is unknown. We therefore cannot conclude the encounter in the parking lot represented a "regular or consistent response to a repeated situation" like the ones depicted in the photos.

37

Beyond that, it is apparent from the photos Reyes was playing to the camera by displaying the guns in a menacing fashion. The fact he posed for pictures a few times in such a manner is insufficient to establish he had a habit of carrying guns and acted in conformity with that habit on the night in question. Thus, the trial court did not abuse its discretion by excluding the photos.

As for defendants' argument that excluding the photos violated their due process right to present a defense, it is well settled the application of the ordinary rules of evidence is generally insufficient to establish a constitutional violation. (See *People v. Boyette* (2002) 29 Cal.4th 381, 414; *People v. Kraft* (2000) 23 Cal.4th 978, 1035.) This case is no exception. Even though the trial court excluded the proffered gun photos under Evidence Code section 352, it allowed the defense to admit a considerable amount of other evidence regarding Reyes and his gang. Because defendants were provided a robust and thorough defense at trial, we find no violation of their right to a fair trial.

V.

FAILURE TO INSTRUCT ON SELF-DEFENSE, IMPERFECT SELF-DEFENSE, OR HEAT OF PASSION

In a related argument, defendants maintain the trial court erred by declining their request to instruct the jury on self-defense and imperfect self-defense. In addition, Johnson separately claims the court improperly rejected his request for instructions on the heat of passion theory of voluntary manslaughter. We find these contentions unavailing.

A. *Background*

As noted in the previous section of our opinion, Metoyer's attorney argued Reyes posed a mortal danger to Metoyer prior to the

38

shooting, based primarily on the underlying gang dynamics surrounding the standoff in the parking lot. In addition, Christopher and Jones both testified Reyes was driving pretty fast when he arrived on the scene in his Camaro. Jones also said Reyes was driving in the same general direction where Metoyer, Jalin, and Butler were standing. Metoyer's attorney argued that, taken together, these factual circumstances warranted instructions on self-defense and imperfect self-defense. While admitting there was no direct evidence to support those theories, he argued it was "circumstantially possible" Metoyer believed it was necessary to shoot Reyes to protect himself or others.

However, the trial court did not see it that way. It determined there was insufficient evidence to support any of the defendants' proposed instructions on these issues.

B. *Applicable Legal Principles*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of [the lesser included offense of] manslaughter." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) These same principles apply to the defense of others. (*People v. Randle* (2005) 35 Cal.4th 987, 997, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172.)

Heat of passion "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is

39

required to form an intent to kill or conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) "If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to . . . reduce the crime to voluntary manslaughter." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

Jury instructions on self-defense or a lesser included offense of murder are required only when there is substantial evidence to support them. (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1081.) "[T]he evidence must be of a quantum or quality that . . . 'a reasonable jury could find persuasive' [citation] or 'evidence . . . "substantial enough to merit consideration" by the jury.' [Citation.] 'Speculative, minimal, or insubstantial evidence [will not suffice].'" (*Ibid*.)

C. *Analysis*

Defendants contend the evidence was sufficient to warrant their requested instructions because it showed Reyes was driving quickly toward Metoyer, Jalin, and Butler before the shooting. But Jones and K.J. testified Reyes had already stopped and/or parked his car by the time defendants started shooting at him and Christopher. There was no evidence the shooting occurred while defendants were in peril of being hit by Reyes's vehicle. Nor did Metoyer say anything to this effect during any of his jailhouse phone calls that were admitted into evidence.

In support of their proposed jury instructions, defendants also point to the gang dynamics surrounding the shooting. They submit they had good reason to believe the victims were armed and dangerous, given the ongoing rivalry between their two gangs. They also point to K.J.'s erroneous

40

belief Reyes and Ruff were the shooters. The suggestion is that if K.J. mixed up what was going on during the shooting, defendants also could have easily confused the events in a manner that made them fear for their own personal safety or the safety of others.

However, even if defendants had reason to believe they were in mortal danger prior to the shooting, they created the circumstances that led to any such belief. In fact, according to defense counsel, the reason Reyes drove toward Metoyer's group in the parking lot is because he saw Metoyer training a gun on his fellow gang members, Ruff and Jones, while Johnson was hemming them in from the opposite direction. Under this theory, Reyes was acting in response to defendants' actions, which would defeat defendants' right to instructions on self-defense, imperfect self-defense, or heat of passion. (*People v. Seaton* (2001) 26 Cal.4th 598, 664; *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1; *People v. Holt* (1944) 25 Cal.2d 59, 66; *People v. Ibarra, supra,* 106 Cal.App.5th at p. 1081; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 83; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1313.)

Moreover, by finding Johnson guilty of first degree premeditated murder and attempted premeditated murder, the jury necessarily determined he acted in a willful, deliberate and premeditated fashion. Because that state of mind "is manifestly inconsistent with having acted under the heat of passion," any error in failing to instruct on the theory of heat of passion was patently harmless. (*People v. Wharton* (1991) 53 Cal.3d 522, 572; *People v. Peau* (2015) 236 Cal.App.4th 823, 830; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1244, 1246; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1138.)

VI.

JURY INSTRUCTIONS ON LYING IN WAIT

Unlike Johnson, who was tried for first degree murder only on the theory of premeditation, Metoyer faced two first degree murder theories at trial: premeditation and lying in wait. Metoyer argues there was insufficient evidence to support jury instructions on the lying-in-wait theory. He also contends the instructions given to the jury on that theory were legally incorrect. We find any error in instructing the jury on the lying-in-wait theory of first degree murder was harmless under any standard of review.

*A. Background*

Under section 189, all murder committed by means of lying in wait is murder in the first degree. (§ 189, subd. (a).) That theory was conveyed to the jury pursuant to CALCRIM No. 521 as follows:

"Metoyer is guilty of first-degree murder if the People have proved [he] murdered while lying in wait or immediately thereafter. [Metoyer] murdered by lying in wait if the following elements are met: One, he concealed his purpose from the person killed; two, he waited and watched for an opportunity to act; and, three, then, from a position of advantage, he intended to and did make a surprise attack on the person killed. The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.

"Deliberation means carefully weighing the considerations for and against a choice, and, knowing the consequences, deciding to act. An act is done with premeditation if the decision to commit the act is made before

42

the act is done. A person can conceal his or her purpose, even if the person killed is aware of the person's physical presence. The concealment can be accomplished by ambush or by some other secret plan."

*B. Analysis*

We first take up Metoyer's claim these instructions were legally inaccurate. The claim is based on Metoyer's belief that the lying-in-wait theory of first degree murder requires proof the defendant harbored malice, meaning either the intent to kill or the intent to inflict injuries likely to cause death, while he was concealing his purpose and waiting for an opportunity to strike.

However, that argument was rejected in *People v. Laws* (1993) 12 Cal.App.4th 786 (*Laws*), which ruled "nothing in section 189 requires the lying in wait to have been done with the intent to kill [or] with the intent to injure." (*Id*. at p. 794.) "The act of lying in wait with secret purpose in order to gain advantage and take a victim unawares is particularly repugnant and of aggravated character so as to justify harsher punishment when the lying in wait results in murder, *even if the waiting and watching were not done with the intent to kill or injure*." (*Id*. at p. 793, italics added.)

Despite the clarity of that language, Metoyer claims it is inconsistent with the Supreme Court's more recent decision in *People v. Brown* (2023) 14 Cal.5th 453. That case involved a murder elevated to first degree on the theory the defendant killed the victim by means of poison, not lying in wait. (*Id*. at pp. 456–457) Although *Brown* did discuss the general mens rea requirements for other types of first degree murder, such as lying in wait and torture, it did not purport to overrule *Laws, supra,* 12 Cal.App.4th 786. To the contrary, *Brown* cited to *Laws* with approval in discussing the mental state required for first degree lying-in-wait murder. (*Brown*, at p.

43

465.) Therefore, the instructions given on that offense in this case were not deficient for failing to require proof Metoyer harbored malice both while he was lying in wait and when he fired at Reyes.

Metoyer also contends there was insufficient evidence to warrant instructions on the lying-in-wait theory of first degree murder. (See generally *People v. Cole* (2004) 33 Cal.4th 1158, 1206 [the trial court may not instruct on a legal theory unless there is substantial evidence to support it].) In Metoyer's view, the evidence shows that, rather than attempting to ambush Reyes or take him by surprise in carrying out the shooting, Metoyer simply reacted rashly in response to Reyes zooming onto the scene in his Camaro. The Attorney General disagrees, arguing the evidence shows Metoyer hid his intent to shoot Reyes until Reyes actually stopped his car away from where defendants were standing.

We conclude we need not decide whether there was substantial evidence to support instructions on the lying-in-wait theory of first degree murder because any error in instructing the jury on that theory was patently harmless.

"When a jury has been instructed on both proper and improper theories for conviction, the appropriate standard of prejudice turns on the type of error involved. If the improper theory 'is incorrect only because the evidence does not support it' [citation], reversal is not required if 'a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground' [citation]." (*People v. Mumin* (2023) 15 Cal.5th 176, 207.)

"By contrast, a legally inadequate theory is not merely incorrect because it is factually wanting but 'because it is contrary to law.' [Citation.] When a given instruction misstates the law, the more demanding standard of

*Chapman v. California* (1967) 386 U.S. 18, 24, applies, requiring reversal unless the error was harmless beyond a reasonable doubt." (*People v. Mumin, supra,* 15 Cal.5th at p. 207.) "'These different tests reflect the view that jurors are "well equipped" to sort *factually* valid from invalid theories, but ill equipped to sort *legally* valid from invalid theories.'" (*People v. Aledamat* (2019) 8 Cal.5th 1, 7.)

In this case, the worst that could be said about the inclusion of the lying-in-wait instructions is that they presented the jury with a factually invalid theory of first degree murder as to Metoyer. Because the jurors were well equipped to detect such an error, reversal is not required unless there is an affirmative indication in the record that the jurors convicted Metoyer of first degree murder based on the lying-in-wait theory, as opposed to the valid theory of premeditation.

There is nothing in the record that so indicates. In fact, although the prosecutor mentioned both theories in his closing argument, he primarily focused on premeditation and appeared to relegate lying in wait to a backup theory of first degree murder.

This strategy made sense because the premeditation theory had greater evidentiary support than the lying-in-wait theory. The jury even made an express finding the attempted murder of Christopher was premediated. Given that Reyes was seated right next to Christopher at the time of the shooting, it is reasonable to infer the jury found the murder of Reyes also was premeditated. Even without knowing whether that was the case, the fact remains there is nothing in the record to suggest the jury ignored the premeditation theory in favor of the lying-in-wait theory in finding Metoyer guilty of first degree murder. Therefore, any error in instructing the jury on the lying-in-wait theory was harmless.

45

## VII.

### CUMULATIVE ERROR

Defendants argue even if the errors they assign to the trial court do not individually justify reversal, the combined effect of those errors does. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1009 ["'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error'"].) But other than the errors warranting reversal of Johnson's murder conviction and the premeditation findings on the attempted murder count, there was only one other potential error (in giving the lying-in-wait instructions), and, as shown above, that error was patently harmless. Therefore, the cumulative error doctrine does not assist defendants.

## VIII.

### CHALLENGE TO SENTENCE ENHANCEMENTS UNDER SECTION 1385

Relying on *People v. Walker* (2022) 86 Cal.App.5th 386, review granted March 22, 2023, S278309, defendants assert the trial court erred in failing to dismiss their sentence enhancements under section 1385. They contend that statute created a rebuttable presumption in favor of dismissal under the circumstances presented in this case, and because the trial court did not find dismissal would endanger public safety, their enhancements must be reversed.

This argument is moot in light of our decision to reverse certain aspects of the judgment and remand the matter for resentencing as to both defendants. In any event, the California Supreme Court recently rejected defendants' argument in *People v. Walker* (2024) 16 Cal.5th 1024, which will control for purposes of resentencing.

46

## IX.

### EQUAL PROTECTION CLAIM

At the time of the shooting, Metoyer and Johnson were both 18 years old. Due to the jury's true finding on the gang special circumstances allegations, they were sentenced to mandatory prison terms of life without parole (LWOP) on the murder counts. (See § 190.2, subd. (a).) If defendants had been under the age of 18 when they offended, or they had been convicted of first degree murder without a special circumstances finding, they would be eligible for a youthful offender parole hearing during the 25th year of their incarceration. (§ 3051, subds. (b)(3) & (4).) But such hearings are not available to defendants who committed special circumstances murder when they were between the ages of 18 and 25. (*Id.*, subd. (h).)

In their opening briefs, defendants argued this disparate treatment violates equal protection. However, that argument is now moot as to Johnson because we are reversing his conviction for first degree murder and the attendant special circumstances finding. And, as Metoyer admits in his reply brief, the Supreme Court recently found his equal protection argument unavailing in *People v. Hardin* (2024) 15 Cal.5th 834, which came down shortly after he filed his opening brief. Accordingly, there is no basis to disturb Metoyer's LWOP sentence on equal protection grounds. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

47

## DISPOSITION

Johnson's conviction for first degree murder in count one is reversed, as are the true findings on the special circumstance and firearm allegations attendant to that count. In addition, as to both defendants, the jury's true findings on the premeditation allegation on the attempted murder charge in count two, as well as defendants' life sentences on that count, are reversed. The matter is remanded for resentencing, and in all other respects, the judgments are affirmed.

GOODING, J.

WE CONCUR:

O'LEARY, P. J.

DELANEY, J.